**OSTLUND CHEMICAL CO., Plaintiff and Appellant,**

v.

**NORWEST BANK OF JAMESTOWN, f/k/a First National Bank of Jamestown, Defendant and Appellee.**

Civ. No. 870077.

Supreme Court of North Dakota.

Jan. 4, 1988.

William G. Dittrick (argued) of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, Neb., and Jon R. Brakke (appearance) of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiff and appellant.

Joseph A. Turman of DeMars, Turman & Johnson, Fargo, for defendant and appellee.

VANDE WALLE, Justice.

Ostlund Chemical Company [Ostlund] appealed from a summary judgment dismissing its action against Norwest Bank of Jamestown, formerly known as First National Bank of Jamestown [Bank]. Because genuine issues of material fact have been raised in this case, we reverse and remand for trial.

The evidence, viewed in the light most favorable to the party against whom summary judgment was rendered, reflects that during March 1982, Bruce Glinz, a farmer, was indebted to the Bank for more than $440,000. Glinz sought $600,000 in operating funds for the 1982 farm year, but because of his deteriorating financial condition, the Bank was unwilling to advance such funds to Glinz on its own. The Bank, however, agreed to accept a Farmers Home

Administration [FmHA] subordination of security to use as collateral for providing operating funds to Glinz. Under this arrangement the Bank provided Glinz a line of credit for $600,000, placed under the control of an FmHA officer and to be disbursed in accordance with a specifically defined budget. The itemized budget provided for a total of $150,000 to be used for pesticides and fertilizers.

During April 1982, Glinz contacted Ostlund in an effort to purchase on credit between $330,000 and $350,000 of farm chemicals and fertilizers for the crop season. In order to verify that Glinz had adequate credit for the proposed purchase, Howard Fairburn, Ostlund's credit manager, contacted the Bank by telephone. Fairburn spoke with Dennis Renner, a vice-president and manager of the Bank's agriculture department, told him about Glinz's request, and asked him if Glinz would have credit available to pay Ostlund's invoices when they became due. Renner responded that Glinz's line of credit was sufficient to cover his purchase of chemicals and fertilizers.

Ostlund then sold fertilizer and chemicals to Glinz on credit. In June 1982, after Glinz had purchased more than $225,000 in products from Ostlund, Glinz told the company that he was unable to make any payments and that the Bank had terminated his line of credit. Ostlund contacted the Bank, which confirmed this information. According to Ostlund, it nevertheless continued to supply Glinz with its products so he could successfully complete the harvest and use the resulting profits to retire his debt to Ostlund.

Glinz did not pay Ostlund, and he subsequently filed for bankruptcy. Although Ostlund recovered more than $87,000 from the bankruptcy trustee, Ostlund contends it is currently owed, exclusive of interest, approximately $214,000.

In December 1983, Ostlund commenced this action against the Bank seeking damages in excess of $300,000. The count of Ostlund's complaint which is involved in this appeal alleges that "[t]he statements and representations made by the Bank to Ostlund ... were statements of material facts made intentionally by the Bank and such statements were false, and such statements were recklessly made by the Bank, and such statements constituted promises made by the Bank without the Bank's intention of performing the same, and such statements were made by the Bank in order to induce [Ostlund] to sell and deliver to Glinz approximately $350,000 worth of chemicals and fertilizers." The Bank counterclaimed and moved for summary judgment. Based upon the depositions of Renner and Fairburn, the district court determined that "[n]o genuine issue of material fact is shown that the conversation between Renner and Fairburn placed Renner in a situation of intending to deceive [Ostlund] or to induce [Ostlund] to enter into a contract with Glinz." The court concluded that Ostlund had failed to show any basis for actual fraud under § 9–03–08, N.D. C.C., or deceit under §§ 9–10–02 and 9–10–03, N.D.C.C., and granted the Bank's motion for summary judgment. The court declined to rule on the issues raised in the Bank's counterclaim, but issued a Rule 54(b), N.D.R.Civ.P., certification, and this appeal followed.

■ Summary judgment is a procedural device available for the prompt disposition of controversies without the necessity of a trial when, viewing the evidence in the light most favorable to the opposing party and giving that party the benefit of all favorable inferences, there is no genuine dispute as to either the material facts or the inferences to be drawn from undisputed facts. *Hillesland v. Federal Land Bank Association of Grand Forks*, 407 N.W.2d 206, 210 (N.D.1987).

■ Because Ostlund conceded at the motion for summary judgment that it was no longer pursuing a case based upon any contract between the parties, we construe Ostlund's remaining count as a tort action for deceit under §§ 9–10–02 and 9–10–03,

N.D.C.C., rather than for actual fraud or constructive fraud under §§ 9–03–08 and 9–03–09, N.D.C.C.[1] See *Hellman v. Thiele,* 413 N.W.2d 321, 325–326 (N.D.1987). Section 9–10–03, N.D.C.C., provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers." Section 9–10–02, N.D.C.C., defines deceit as follows:

"*9–10–02. Deceit—Definition.* A deceit within the meaning of section 9–10–03 is:

"1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

"2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

"3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

"4. A promise made without any intention of performing."

In *Hellman, supra,* 413 N.W.2d at 326, we noted that a party may be held liable for nondisclosure under § 9–10–02(3), N.D.C.C., only if that party is under a duty to disclose the "true facts."[2] The plaintiffs in *Hellman,* creditors of an insolvent bank customer, sued the bank alleging that it engaged in a pattern of paying the customer's overdrafts, knowing the customer was insolvent, in an effort to keep the customer's business afloat long enough for the bank to become fully secured on its various loans to the customer. We upheld the district court's grant of summary judgment against one group of plaintiffs "who had had no contacts with the Bank regarding [the customer's] financial status." *Hellman, supra,* 413 N.W.2d at 323. We reviewed decisions from other jurisdictions holding that, in general, a bank is under no affirmative duty to disclose to the world a customer's financial condition. We held that the group of plaintiffs who had not communicated with the bank failed to establish through statute, rule, or other authority that the bank had a duty to disclose to them the customer's true financial condition.

This case differs from *Hellman.* Ostlund alleges that it made a specific inquiry concerning the availability of credit for Glinz's proposed chemical purchases and received a misleading response from the Bank, which stood in a position to benefit from Glinz's production of a good crop.

While the Bank was originally under no duty to divulge any information about Glinz's credit status, we believe that once the Bank chose to reply to Ostlund's inquiry it had a duty to impart full, accurate, and truthful information. See *Berkline Corp. v. Bank of Mississippi,* 453 So.2d 699, 702 (Miss.1984); *Nevada National Bank v. Gold Star Meat Company,* 89 Nev. 427, 514 P.2d 651, 653 (1973); Annot., "Liability of bank, to other than party whose financial condition is misrepresented, for erroneous credit information furnished by bank or its directors, officers, or employees," 77 A.L.R.3d 6 (1977); cf. *Holcomb v. Zinke,* 365 N.W.2d 507, 511–512 (N.D.1985). The Sixth Circuit Court of Appeals responded to criticism of this rule in *Central States Stamping v. Terminal Equip. Co.,* 727 F.2d 1405, 1409 (6th Cir. 1984):

"§ 551. Liability for Nondisclosure

"(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

---

1. Because Ostlund has relied principally upon the statutory provisions on fraud and deceit as the basis for its action, we do not consider whether Ostlund's complaint can be construed as alleging a cause of action based upon negligent misrepresentation.

2. In *Hellman v. Thiele,* 413 N.W.2d 321, 326 (N.D.1987), we further noted that this rule is the same under § 551(1) of the Restatement (Second) of Torts (1977), which provides:

"The Bank argues that this rule is unworkable and would 'dry up' normal communications from banks which are essential to the functioning of the economy. Such a result is not inevitable. In an English case which was similar to ours, *Hedley Byrne & Co., Ltd. v. Heller & Partners, Ltd.*, [1964] A.C. 465, 486, Lord Reid pointed out that a banker who receives an inquiry about the credit-worthiness of a customer has three courses open. The banker can decline to give the information; he can give an answer with a clear qualification that it is given and accepted without any responsibility or is given without reflection or research; or, the banker can give an answer without qualification. Lord Reid concluded that if a banker adopts the third alternative he can be held to have accepted some responsibility for answering carefully or to have accepted a relationship with the inquirer which requires him to exercise such care as circumstances require.

"*Hedley Byrne* was not a fraud case but involved a negligent answer by a banker. However, it dealt instructively with the duty to speak once a relationship is established in which the person questioned knows that the inquirer is relying on the fact that he, the person questioned, has superior information. The duty is particularly clear when the party answering the inquiry benefits directly from the actions of the inquiring party...."

■ In this case, Glinz was indebted to the Bank on other loans for more than $440,000. Regarding the $600,000 line of credit for the 1982 farm season, Renner testified in his deposition as follows:

"Q Why don't you explain to me then this subordination agreement between the Jamestown bank and FHA [sic]?

"A Okay. His credit had deteriorated to the point were [sic] we could not advance operating funds on our own in 1982.

"Q Why was that?

"A Because of the financial health of Mr. Glinz, it had deteriorated, the collat-eral was insufficient, it just didn't—the credit didn't support the bank going in with that type of an operating request that he had needed. He was looking for about $600,000.

"*So, we recognized that, you know, if Mr. Glinz was going to attempt to perform on his debts he would need to grow a crop to generate some income over and above the operating expenses so that he could perform on his other term debts, so to speak. So, we agreed to accept an FHA [sic] subordination.*" [Emphasis added.]

The evidence also permits a reasonable inference that Renner had knowledge of the itemized budget categories for the $600,000 line of credit at the time Fairburn telephoned him to verify that Glinz had a sufficient line of credit to pay for the proposed chemical and fertilizer purchases. Furthermore, regarding the telephone conversation, Fairburn testified in his deposition as follows:

"Q Now, what specifically—and I want you to be as precise as you can—did Mr. Renner tell you during the course of this telephone conversation?

"A We discussed the fact that the bank was looking at $600,000 worth of credit for Bruce Glinz for the 1982 crop year. I indicated what our amount or the amount that Bruce had indicated to us would be his chemical needs and I also indicated the date that the payment would be coming due or be expected. And I asked if the credit would be available for him to be able to take his accounts and pay his invoices at that point in time. And our conversation was that there would be credit available.

"Q All right. *Are you trying to tell me that Mr. Renner told you that out of a $600,000 line of credit that there would be $350,000 available for chemicals?*

"A *He indicated that to me, that they would have credit available to pay the bill when it came due, yes.*" [Emphasis added.]

Viewed in the light most favorable to Ostlund, the evidence in the record is sufficient to raise genuine issues of material fact on whether the Bank has committed an actionable deceit within the meaning of §§ 9–10–02 and 9–10–03, N.D.C.C.

Accordingly, the summary judgment is reversed and the case is remanded for trial.

ERICKSTAD, C.J., MESCHKE and GIERKE, JJ., and DOUGLAS B. HEEN, Surrogate Justice, concur.

DOUGLAS B. HEEN, Surrogate Justice, sitting in place of LEVINE, J., disqualified.